HAWTHORNE, Justice.
 

 Plaintiff, Joe H. Crosby, liquidator of the Modern Iron Works, Inc., instituted this suit against the defendants, Little River Sand and Gravel Development et al., praying for judgment in the sum of $4,211.79, with legal interest from judicial demand, alleging that the defendants owed this amount as balance for labor and materials used in building and constructing for defendants a tugboat and a barge and overhauling and repairing a dragline and a clam shell bucket, all in accordance with an itemized statement attached to, and made part of, his petition.
 

 Plaintiff caused a writ of sequestration to issue, and under this writ the barge constructed by plaintiff for defendants was seized. In due course defendants obtained the release of this barge from the seizure by executing bond in the sum of $4,500.
 

 
 *4
 
 Defendants in their answer denied each and every item of the account and demanded strict proof thereof. They alleged that plaintiff had agreed to furnish the labor for the work at actual cost to him, plus $3 per hour for the services of a shop foreman for actual time spent on such work, and the cost of any material purchased by plaintiff, plus 10 per cent of the price of such material, and that plaintiff had agreed to complete the work within a period of six months.
 

 Defendants further alleged that plaintiff had not performed the work in a satisfactory manner, and that his delay in performing such work and delivering the equipment to defendants had caused them to be damaged in the sum of $20,114.12. They prayed for judgment in this amount in reconvention.
 

 During the progress of the trial, however, defendants entered a voluntary non-suit as to all reconventional demands except the one for the sum of $2,327.19, which they alleged was paid by them to a third party for rent of a dragline because of the unsatisfactory work and delayed delivery of the dragline which plaintiff was to overhaul and repair for them.
 

 The district court rendered judgment in favor of plaintiff and against defendants, Little River Sand and Gravel Development, Sidney G. Myers, Joseph G. Sellwood, and Richard M. Sellwood, Jr., as commercial partners, individually and in solido, for the full amount of plaintiff’s claim, plus interest and costs; maintaining the writ of sequestration issued herein and with full recognition of plaintiff’s lien and privilege on the property sequestered thereunder, and rejecting defendants’ reconventional demand. From this judgment all defendants have appealed.
 

 Of the total amount of the account sued on, approximately $600 was for freight, express, materials, etc., paid by plaintiff for the account of the defendants, the largest of these items being freight for approximately $300. Defendants do not deny the correctness of these charges, but on the contrary admit in argument before this court that they are due. However, they do seriously contest the correctness of the amount charged for labor, which is a sum in excess of $3,600.
 

 The amount which plaintiff claims for labor is evidenced by documents called “job sheets”, which were introduced and filed in evidence in the lower court. To these documents defendants’ counsel objected for the reason that they were hearsay and were not properly proved and were an attempt on the part of the plaintiff to prove an open account in globo without giving the items as to dates and amounts.
 

 The evidence discloses that the Modern Iron Works, Inc., of which plaintiff Crosby is the liquidator, is a machine shop situated in the City of Shreveport and is engaged principally in the repairing of machinery.
 

 In keeping the time of the various employees, plaintiff used a time clock system,
 
 *5
 
 and each employee had a weekly time card which was punched to show his actual working hours. From these time cards each employee was paid his hourly rate according to the number of hours which he may have worked in any one week at plaintiff’s plant.
 

 Plaintiff also used another card very similar in appearance, designated as the “job card”. Each job was given a number, and these job cards indicated the actual hours an employee worked on any particular job, giving the name of the employee and class of work performed by him, such as welding, etc. When the worker was assigned to a particular job, his job card was punched at the time clock, and, at the completion of his work on the job to which he had been assigned, his job card was again punched at the same clock to show the actual number of hours which he worked on the particular job to which he was assigned. The worker was then given another assignment and another job card. By this system, plaintiff had not only the number of hours each employee worked, as shown by the time cards which were used for payroll purposes and for computing social security and insurance, but also the job cards, which showed the number of hours the same employee had worked on any particular job. It was necessary for each worker’s time card and his job card to balance' or tally at the end of each day, so as to show no discrepancy with regard to the number of hours worked by him during that day.
 

 Plaintiff and his superintendent, J. W. Fort, kept the time of each employee, and these time and job cards were under their sole supervision and control. At the end of each day the job cards were delivered to the office, and from these cards the “job sheets” were made up. These job sheets also showed the name, initials, or nickname of every man who worked on the particular job, the number of hours he worked thereon, and his rate of pay per hour. These job sheets were made up from day to day as the labor was expended. The information shown on each job card was posted on the job sheet under the supervision of Crosby, who thereafter checked each job sheet to ascertain whether it was correct and indicated the correctness by initialing each job sheet in the corner.
 

 From these job sheets, the invoices on each particular job performed by plaintiff for defendants, such as the amount due on the tugboat, the barge, etc., were made up, as well as the itemized account attached to plaintiff's petition.
 

 Plaintiff at no time offered in evidence the job cards themselves, stating that it was not his custom or practice to keep the job cards on any particular job, and that, soon after the information contained on the job cards was posted to the job sheets, the job cards were destroyed, and that it was for this reason that they were not available. The accountant who was head of plaintiff’s bookkeeping department carro
 
 *6
 
 borated plaintiff’s testimony as to his practice and custom of destroying these cards.
 

 The record shows that some of the machine shops in the Shreveport area did preserve their job cards. Although in our opinion it would be better to keep such cards in order to avoid litigation such as this, it apparently was not the custom of all machine shops in this area to keep these cards.
 

 The superintendent of the Pelican Well Tool & Supply Company testified that it was not the custom or practice of that organization to keep such cards because they became old and greasy from the hands of the workers, and that, after they had been posted or copied to the permanent records of that company, they were destroyed, as they served no further purpose.
 

 The suit in this case was filed on September 10, 1943, and a few days previous thereto, on August 26, R. F. Gates, auditor for the defendants, visited the machine shop of plaintiff and requested permission to examine the original records of the plaintiff in order to verify certain invoices which he had with him. Plaintiff refused to permit this auditor to examine the original records, but told his bookkeeper to examine or look at the records and give Mr. Gates the dates of certain invoices. Plaintiff admitted that he refused to permit defendants’ auditor to examine his original records and gave in explanation thereof, as we understand it, that the work which he was doing for the. defendants was practically over, and that he could not change his system of keeping records to accommodate others, and that he would not permit any outsider to examine his records without a court order.
 

 A reading of the entire record discloses that the circumstances attendant upon the destruction of the particular job cards involved in this litigation were free from fraud, and that these job cards were not destroyed with the intention of giving plaintiff an unfair advantage over defendants, and that these particular cards were destroyed according to plaintiff’s practice, just as all other job cards had been so destroyed; or, in other words, that these job cards were not deliberately destroyed with fraudulent intent so that plaintiff would have an unfair advantage of the defendants herein.
 

 Plaintiff has established to our satisfaction that the job cards themselves were posted daily as the labor on these particular jobs was expended, under his personal supervision, after he had checked each and every sheet with the job cards themselves to determine the correctness thereof, as indicated by his initial or name thereon. This being so, in the absence of any showing that these cards were destroyed under any unusual circumstances, as pointed. out hereinabove, we are of the opinion that the job sheets themselves were properly admitted in evidence by the trial judge, especially when considered in connection with the testimony of plaintiff and of Roberts,
 
 *7
 
 the accountant, who was head of the bookkeeping department of plaintiffs shop, as to the correctness thereof.
 

 “A party to a trial is not precluded from introducing secondary evidence of the contents of a destroyed instrument although he himself destroyed the instrument deliberately and voluntarily, if at the time he did so, he acted under an erroneous impression as to the effect of his act or under other circumstances which render his act free from all intention of fraud. In such cases, however, it is essential to show by competent evidence facts which are sufficient to rebut all inference of a fraudulent intent or purpose arising from the act of destruction. * * *” 20 Am.Jur., “Evidence”, Section 438, page 391.
 

 “Secondary evidence is admissible, where the primary evidence of the fact sought to be proved has been destroyed by the party seeking to establish the fact, only where such destruction was by accident or mistake or free from circumstances of fraud.” 32 C.J.S., Evidence, § 824, page 752.
 

 Defendants in brief filed in this court contend that plaintiff destroyed these particular job cards after- an inspection of his .original records had been requested by defendants, but we cannot agree with this contention. On the contrary, we are of the opinion that the record does not support any such charge. We have no evidence as to when the job cards were destroyed, and, in one instance during the cross-examination of plaintiff by defendants’ attorney, plaintiff attempted to give an explanation as to why the job cards themselves were not available, but counsel for defendants informed him that he was not interested in an explanation. Plaintiff at other times in his testimony- fully explained to our satisfaction their destruction.
 

 In brief filed here and in argument before this court, defendants contend that the job sheets admitted in evidence were not properly admitted, and cite Article 2248 of the Civil Code, which provides that the books of- merchants cannot be given in evidence in their favor. After citing this article, they quote from numerous opinions of this court (beginning with one in 2 Mart.N.S. and ending with one in 19 La. Ann.), in which the rule as given in the article has been applied, the last, cited decision being rendered in 1867.
 

 This court in recent years has greatly relaxed the stringent rule of Article 2248, and under modern business methods to apply the rule would in many instances work grave injustices. Under the proof and evidence here adduced that the job sheets themselves were made under the personal supervision of plaintiff and that he personally checked each job sheet and initialed it to show the correctness thereof, and in view of the testimony of Roberts, plaintiff’s bookkeeper, that the account sued on was true and correct, we are of the opinion that the rule-should not be applied in this case.
 

 
 *8
 
 Defendants further contend that the lower court erred in allowing plaintiff any claim for labor above the actual amount paid by plaintiff for such labor, for the reason that plaintiff agreed to furnish the labor for the work at actual cost, plus $3 per hour for the services of a shop foreman.
 

 The record convinces us that plaintiff agreed to build the barge and the tugboat and repair the dragline and to charge defendants therefor for the labor expended on an hourly cost basis, which was the charge to be made to the customer for the labor instead of the amount actually paid by the plaintiff for such labor.
 

 At the time this work was done, the ceiling prices of labor to be charged to the customers of industrial machine shops were under the exclusive control of the United States government under its war power. These ceiling or maximum hourly prices for the various types of labor were based on schedules submitted by the machine shops and were fixed and approved under regulations of a governmental agency. The difference between the actual price paid by the machine shops to the laborers and the ceiling price charged to the customer, under the government schedule, after being applied on expenses, such as upkeep, insurance, and taxes, afforded the machine shop all or part of its profit on its transactions.
 

 This plaintiff had furnished to the governmental agency a schedule giving his ceiling prices to be charged to the customer for the various classes of workers, such as welders, machinists, etc., and his charges actually made to the defendants were less than his ceiling prices as fixed by his schedule filed with the governmental agency, although his charges to defendants were' above the actual cost of labor to him.
 

 If defendants’ contention were correct that they were to pay only the actual amount paid by plaintiff for the labor performed in this work, there would be no profit whatsoever to the plaintiff since he made only 10 per cent of the cost of the small amount of material purchased by him for defendants’ account. On the contrary, as testified by him, he could not remain in business if he charged for labor on such a basis, and the work would have been performed at an actual loss, as he would not even get enough out of the job to pay insurance, taxes, etc.
 

 Plaintiff has proved to our satisfaction that he agreed to furnish the necessary labor for which defendants were to pay on an hourly cost basis, and that “hourly cost basis”, according to the prevailing custom of the various machine shops in this area, meant what the customers paid and had nothing whatsoever to do with the actual amount' paid by the machine shops to the employees, but was according to the prices fixed by the governmental agency for the various classes of work or any lesser amount which the shops chose to
 
 *9
 
 charge. In other words, the hourly cost basis charged by machine shops during the period of time in which this work was performed meant the cost to the customer, which was not in any case the actual labor costs to the particular machine shop.
 

 We therefore think that plaintiff is entitled to recover from defendants for labor charges on an “hourly cost basis”, within the proven meaning of that term.
 

 In their reconventional demand defendants contend that the work done on the dragline by plaintiff was unsatisfactory and that due to such unsatisfactory work it was necessary for them to rent another" dragline for which they paid the amount now claimed in reconvention. The defendants well knew, at the time they requested plaintiff to return the dragline to them, that the work on the dragline was not completed, and that it was not ready for service. Moreover, there is no proof that it was to be completed within any specified time or that plaintiff was responsible for any undue delay in repairing the dragline.
 

 In our opinion, the trial judge properly dismissed defendants’ reconventional demand, since defendants failed to prove their claim by the preponderance of the evidence.'
 

 For the reasons assigned, the judgment appealed from is affirmed at defendants-appellants’ costs.